UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                        Docket #24m2753
 UNITED STATES OF AMERICA,          :

                    Plaintiff,      :

   - against -                      :

 GOUDREAU, JORDAN GUY McDONALD,     : New York, New York
                                      July 30, 2024
                    Defendants.      :

------------------------------------ :

                    PROCEEDINGS BEFORE
                  THE HONORABLE GARY STEIN,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                        BY:  GEORGIA KOSTOPOULO, ESQ.
                        One St. Andrew's Plaza
                        New York, New York 10007

For Defendant:          HANNAH McCREA, ESQ.

Also Present:           SPECIAL AGENT JACOB HAMILTON
                        FBI




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

### INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                    3

 2            THE CLERK:  In the matter of U.S.A. v. Goudreau.

 3   Counsel, would you please state your name for the record,

 4   starting with the Government.

 5            MS. GEORGIA KOSTOPOULOS:  Good afternoon, Your

 6   Honor, Georgia Kostopoulos for the Government, and I'm

 7   joined by Special Agent Jacob Hamilton of the FBI.

 8            THE COURT:  Good evening to you both.

 9            MS. HANNAH McCRAE:  Good evening, Your Honor,

10   Hannah McCrae on behalf of Mr. Goudreau.

11            THE COURT:  Good afternoon to you, and good

12   afternoon to you, Mr. Goudreau.  Can I have the date and

13   time of arrest please?

14            MS. KOSTOPOULOS:  11:45 a.m. this morning, Your

15   Honor.

16            THE COURT:  Thank you.  Do you have the Rule

17   5(c)(3) affidavit in front of you, Ms. Kostopoulos, and

18   if so, can you put it in front of Agent Hamilton?

19            MS. KOSTOPOULOS:  Yes, we do, Your Honor.

20            THE COURT:  Great.  And has a copy been provided

21   to defense counsel?

22            MS. KOSTOPOULOS:  Yes, we've provided it to all

23   parties.

24            THE COURT:  All right.  Agent Hamilton, please

25   rise.  Can you raise your right hand?  Do you swear or
```

```
 1                          PROCEEDINGS                    4
 2   affirm that the contents of this Rule 5(c)(3) affidavit
 3   are true and correct, so help you God?
 4              AGENT HAMILTON:  I do.
 5              THE COURT:  Could you please sign it?
 6              (pause in proceeding)
 7              THE COURT:  And, Ms. Kostopoulos, if you can
 8   hand it up, I will sign it as well.
 9              (pause in proceeding)
10              THE COURT:  All right, Mr. Goudreau, I'm
11   Magistrate Judge Stein.  You're here because you've been
12   arrested on an indictment issued out of the Middle
13   District of Florida.  The purpose of today's proceeding
14   is to advise you of certain rights that you have, to
15   inform you of the charges against you, to consider
16   whether counsel should be appointed on your behalf, and
17   to decide under what conditions if any you should be
18   released pending trial.
19              I'm first going to explain certain
20   constitutional rights that you have.  You have the right
21   to remain silent.  You are not required to make any
22   statements to the authorities.  Even if you have already
23   made statements to the authorities, you need not make any
24   further statements.  Any statements that you do make can
25   be used against you.
```

```
 1                          PROCEEDINGS                    5

 2           You have the right to be released pending trial,

 3   either with or without conditions, unless I find that

 4   there are no conditions that would reasonably assure your

 5   presence at future court proceedings and the safety of

 6   the community.

 7           If you are not a U.S. citizen, you have the

 8   right to request that a consular officer from your

 9   country of origin be notified of your arrest.  In some

10   cases a treaty or other agreement may require the United

11   States government to give that notice whether you request

12   it or not.  And I am required to explain this to you even

13   if you are a U.S. citizen and it doesn't apply to you.

14           You have the right to be represented by an

15   attorney during all court proceedings, including this

16   one, and during all questioning by the authorities.  You

17   have the right to hire your own attorney, but if you

18   cannot afford to hire your own attorney, the Court will

19   appoint one to represent you.  Do we have an application

20   for appointment of counsel?

21           MS. McCRAE:  Your Honor, I understand Mr.

22   Goudreau has a retained attorney in this matter, and so

23   I'm going to stand up for this proceeding, for the

24   5(c)(3), and then we'll take it from there if there's

25   need for appointment.  But I don't anticipate one in this
```

```
 1                          PROCEEDINGS                    6
 2   district.
 3              THE COURT:  Okay.  Very well.
 4              (pause in proceeding)
 5              THE COURT:  All right, I have before me the
 6   arrest warrant and the charging instrument which, as I
 7   mentioned, is an indictment out of the Middle District of
 8   Florida.  You are charged in this indictment with several
 9   crimes, 14 counts.  Those include conspiracy to knowingly
10   and willfully export and cause to be exported from the
11   United States to Colombia defense articles without having
12   obtained a license, as well as conspiring to knowingly
13   and willfully export and cause to be exported from the
14   United States to Colombia items on the Commerce Control
15   List and without a license, and also conspiring to
16   fraudulently and knowingly export and send from the
17   United States certain merchandise, articles, and objects
18   contrary to law and regulation.  That's count 1.
19              Additional counts charge you, in court 2, with
20   smuggling goods from the United States, specifically
21   lower bulk receivers.  Count 3 charges you with
22   smugglings goods from the United States in the form of
23   semiautomatic AR type firearms.  Counts 4 through 8
24   charge you with violations of the Arms Export Controls
25   Act relating to items designated as defense articles on
```

```
 1                        PROCEEDINGS              7
 2   the United States munitions list.  Counts 9 through 12
 3   charge you with violations of the Export Control Reform
 4   Act of 2018 and relate to items on the Commerce Control
 5   list.  Count 13 charges you with violation of the
 6   National Firearms Act in that you knowingly possessed
 7   eight silencers.  Count 14 charges you with unlawful
 8   possession of a machine gun, and that is the last count.
 9   In addition, there's a forfeiture allegation in the
10   indictment seeking to forfeit property of yours involved
11   in the offenses.
12            Ms. McCrae, have you received a copy of the Rule
13   5(1)(c) affidavit and the indictment and reviewed them
14   with your client?
15            MS. McCRAE:  Yes, Your Honor.
16            THE COURT:  Your client for purposes of today?
17            MS. McCRAE:  Yes.
18            THE COURT:  Does your client waive a public
19   reading?
20            MS. McCRAE:  We do, Your Honor.
21            (pause in proceeding)
22            THE COURT:  Now, Mr. Goudreau, I'm required to
23   tell you that you may chose, if you wish, to be
24   prosecuted in this district, here in the Southern
25   District of New York, if you wish to plead guilty here
```

```
 1                          PROCEEDINGS              8
 2   and waive trial in the Middle District of Florida, and if
 3   the U.S. Attorneys in both this district and in the
 4   Middle District of Florida approve the transfer.
 5   However, if you chose to plead not guilty or both U.S.
 6   Attorneys do not agree to let you proceed here, then you
 7   will need to go back to the Middle District of Florida
 8   for all further proceedings.  Ms. McCrae, recognizing
 9   that you're only standing in for today, does your client
10   waive his rights under Rule 20 to be prosecuted in this
11   district?
12           MS. McCRAE:  Yes, Your Honor.
13           THE COURT:  All right.  Mr. Goudreau, you also
14   have the right to a hearing on the issue of whether you
15   are the person named in the indictment.  Ms. McCrae, does
16   your client waive his right to an identity hearing?
17           MS. McCRAE:  Yes, Your Honor.
18           THE COURT:  Now, in accordance with Federal Rule
19   of Criminal Procedure 5(f), I remind the prosecution of
20   its obligation under Brady v. Maryland and its progeny to
21   disclose to the defense all information whether
22   admissible or not that is favorable to the defendant,
23   material either to guilt or to punishment, and known to
24   the prosecution.  Possible consequences for non-
25   compliance may involve dismissal of individual charges or
```

```
 1                        PROCEEDINGS              9
 2   the entire case, exclusion of evidence, and professional
 3   discipline or court sanctions on the attorneys
 4   responsible.  Does the prosecution confirm that it
 5   understands these obligations and will fulfill them?
 6            MS. KOSTOPOULOS:  We do, Your Honor,
 7   recognizing, of course, that we're not the prosecuting
 8   office, but we'll certainly convey the 5(c)(3) ordered
 9   tendered by the Court to the Middle District of Florida.
10            THE COURT:  Thank you.  All right, is there an
11   agreement with regard to detention or release pending
12   trial?
13            MS. KOSTOPOULOS:  I believe there is not, Your
14   Honor.  The Government is seeking detention in this case.
15            THE COURT:  And, Ms. McCrae --
16            MS. McCRAE:  We are seeking release.
17            THE COURT:  You're seeking release, all right,
18   very well.  Okay.  Let me ask Ms. Kostopoulos on what
19   grounds the Government is seeking detention?
20            MS. KOSTOPOULOS:  Thank you, Your Honor.  We're
21   specifically seeking detention on several grounds.
22   First, under 18 U.S.C. 3142(f)(1)(E) for a felony that is
23   not otherwise a crime of violence that involves a
24   possession or use of a firearm.  Here, in addition to the
25   counts that charge the defendant with smuggling military
```

1                          PROCEEDINGS                    10

2   equipment and assault style rifles out of the United

3   States in connection with the attempted violent coup in

4   another country, count 14 specifically charges the

5   defendant with possession of machine guns.  And then in

6   terms of the factors that weigh in favor of detention

7   here, under 3142(f)(2)(A) and (f)(2)(B), our position is

8   that there is both a serious risk that the defendant will

9   flee and that he will obstruct or attempt to obstruct

10  justice as well as a danger to the community.  And I'm

11  happy to be heard on each of those grounds.

12          THE COURT:  All right.  Okay, this is not a

13  presumption case though?

14          MS. KOSTOPOULOS:  It is not, Your Honor, no.

15          THE COURT:  Okay.  All right.  Mr. Goudreau, as

16  I mentioned before, I am required under the law to

17  release you either with or without conditions imposed

18  unless I determine, and the Government is asking me to

19  make this determination, that there are no conditions

20  that will reasonably assure your appearance in court as

21  required and ensure the safety of the community.  You

22  just heard the Government lawyer explain the grounds on

23  which it is seeking detention.  I'm going to listen both

24  to the Government's lawyer and to Ms. McCrae on that

25  issue.  In making this determination, I'm required to

1                          PROCEEDINGS                    11

2   consider several factors including the nature and

3   circumstances of the offense charged, the weight of the

4   evidence against you, your history and characteristics,

5   and the nature and seriousness of the danger to any

6   person or the community that would be posed by your

7   release.

8            Now, in this case it is the Government that

9   bears the burden of establishing either by clear and

10  convincing evidence that there are no conditions that can

11  ensure the safety of the community or by establishing by

12  a preponderance of the evidence that there are no

13  conditions that can ensure your appearance as required.

14  All right.  So I'll now hear from the Government.

15           MS. KOSTOPOULOS:  Thank you, Your Honor, and I

16  recognize that we're beginning somewhat late in the

17  evening, but this case has a complex history and in

18  particular I think has a number of facts that wouldn't

19  have been know to Pretrial but I think weigh heavily in

20  favor of detention here.  And so I just want to go

21  through and outline each of them step by step for the

22  Court.

23           So, first, I'll start perhaps with the most

24  obvious which is the nature and circumstances of the

25  offenses.  This is extremely serious conduct that the

```
 1                          PROCEEDINGS                    12

 2   defendant is charged with.  This is a sophisticated

 3   scheme that's a 14-count indictment to export military

 4   grade equipment, firearms, laser sights, and night vision

 5   devices, military grade equipment, in order to be used in

 6   an armed incursion in Venezuela.  That armed incursion

 7   was unsuccessful, but it resulted in the deaths and

 8   imprisonment of two former Green Berets, and it was

 9   conducted without licenses, without authorization.

10   Essentially, the defendant was part of a group of

11   individuals that sought to smuggle these extremely

12   dangerous and highly regulated forms of equipment and

13   firearms into Colombia.

14          With the Court's permission, I'd like to

15   approach, and I've provided photographs to defense

16   counsel as well of some of the equipment that was

17   recovered in Colombia that are basis of the charges

18   because I think they help shed light on the significance

19   of the charges against the defendant and the volume of

20   equipment that was smuggled by the defendant in

21   connection with these charges.  And defense counsel has

22   seen a copy of this.

23          THE COURT:  You may approach.

24          (pause in proceeding)

25          MS. KOSTOPOULOS:  So just flipping through the
```

```
 1                        PROCEEDINGS                 13
 2   pages, Your Honor, you'll note that there are numerous
 3   images of various guns, rifles, ammunition, night
 4   goggles, laser sights, and other military equipment and
 5   ammunition that were recovered in connection with the
 6   charges brought against the defendant.  And as a result
 7   of that, the defendant is facing extremely serious
 8   penalties, a 20-year maximum sentence for the exports
 9   related violations and a 10-year maximum for the
10   smuggling of firearms and silencers, some of which are
11   photographed in the exhibits we've provided to the Court.
12            THE COURT:  Is there a mandatory minimum?
13            MS. KOSTOPOULOS:  There is not a mandatory
14   minimum, Your Honor, no.  The second factor that weighs
15   heavily in favor of detention here is the weight of the
16   evidence.  As noted in one of the exhibits before, Your
17   Honor, the defendant's DNA was recovered on one of the
18   machineguns that was sieved in Colombia.  I believe
19   that's exhibit J.  I've provided now both of my copies to
20   defense counsel and the Court.  But one of the pages
21   includes a photograph of the machinegun from which the
22   defendant's DNA was collected.  There are order
23   confirmations and text messages reflecting the
24   defendant's purchase of these control items.  There's
25   testimony anticipated from witnesses who participated in
```

```
1                          PROCEEDINGS                14
2   this scheme with the defendant.
3           And, frankly, Your Honor, and this will be a
4   theme when we talk about the flight risk, extremely
5   incriminating, Google search history.  So, for example,
6   will I lose my VA benefits if I'm indicted?  How do you
7   prove export of weapons?  Smuggle guns crimes, and how do
8   you prove gun smuggling?  The defendant was aware at
9   least in 2020 based on press coverage that he was
10  investigated for this conduct, and as we'll note later
11  when we talk about the risk of flight, he took a number
12  of steps to research how he could evade law enforcement,
13  how he could go off the grid, and what steps he would
14  need to take in order to not end up in this courtroom,
15  frankly, today.  And that's --
16          THE COURT:  Could you just repeat the timing of
17  what you said about when the defendant was aware he was
18  under investigation?
19          MS. KOSTOPOULOS:  So our understanding, Your
20  Honor, is that there was press coverage both about this
21  failed military operation as well as the defendant's
22  potential involvement in smuggling some of the equipment
23  that was ultimately the basis of these charges in May of
24  2020.  And at that point law enforcement obtained Google
25  search history from the defendant's accounts, various
```

1                              PROCEEDINGS                    15

2   electronic accounts associated with the defendant that

3   show that he was not only repeatedly monitoring news

4   coverage of the investigation into his misconduct, but

5   also, as we'll talk about later, Googling and searching

6   extensively for how he could evade law enforcement, how

7   he could flee from the United States, what countries he

8   could seek asylum in, and how he could be, just to

9   provide an example, a sophisticated fugitive.  That was

10  one of the searches and articles that the defendant

11  reviewed in May 2020 after this investigation at that

12  time became public.  So that's a significant --

13           THE COURT:  I don't mean to --

14           MS. KOSTOPOULOS:  Of course.

15           THE COURT:  -- interfere or get ahead of where

16  you are in your presentation, but in addition to the

17  Googling about things he could do, did he do any of those

18  things?

19           MS. KOSTOPOULOS:  He did, Your Honor.  So in, at

20  some point between, and I don't believe that we know the

21  specific date for reasons I'll explain, but at some point

22  between 2020 and 2024, our understanding is that the

23  defendant started to take steps to essentially move his

24  online presence off the grid.  And one of the things that

25  he did was travel illegally to Mexico without using sort

1

2    of customary channels that would've identified his travel

3    to law enforcement.

4           And so what law enforcement recovered

5    specifically was a receipt of travel showing that the

6    defendant had illegally entered and returned from Mexico,

7    but there was no record of his travel associated with his

8    passport.  And there are internet searches that the

9    defendant conducted at around the same time as some of

10   these searches that I mentioned before where he was

11   essentially looking for how he could travel into and out

12   of the country without being detected which is precisely

13   what the visa receipt that was located by law enforcement

14   seems to suggest, essentially how can I travel south to

15   Guatemala illegally.  That's one of the searched the

16   defendant ran.  How can I ride the beast Mexico south to

17   Guatemala?  That was another search that the defendant

18   ran.  How to bypass the Darién Gap.  That was another

19   search that the defendant ran.  Best place for asylum.

20   Apply for political asylum.  These were all steps the

21   defendant was taking when he learned that he was under

22   criminal investigation for this conduct, and now that

23   those charges have been unsealed and brought against him,

24   frankly, Your Honor, they're proof positive that the

25   defendant has the means and the willingness to engage in

1                           PROCEEDINGS                   17

2    precisely the type of risk of flight that's

3    (indiscernible) 3142(f).

4              Some of these searches --

5              THE COURT:  But of course he's here.

6              MS. KOSTOPOULOS:  He is, Your Honor, but there

7    are additional steps that he has since taken in order to

8    evade law enforcement.  And so I understand in his

9    Pretrial interview the defendant claimed that he's been

10   living openly in the United States, living in New York,

11   living with his partner or his girlfriend.  According to

12   my conversations with the Middle District of Florida as

13   well as the law enforcement agents who were tasked with

14   arresting the defendant, and this is consistent I think

15   with the searches the defendant was running at the same

16   time, the defendant stopped updating his DMV records.  He

17   told his vehicle.  He started running searches on the

18   dark web for how to avoid having his bank accounts be

19   tracked.  He started searching for forms of

20   cryptocurrency that can't be traced or that are

21   untraceable.

22             And each of these steps, Your Honor, according

23   to the Middle District of Florida and the FBI who were

24   tasked with arresting the defendant made it extremely

25   difficult to locate him.  So while the defendant may

1                                PROCEEDINGS                    18

2   claim that he was living openly in New York, there were

3   numerous signs that the defendant was taking steps to

4   avoid a public, sort of a public identity, that he was

5   trying to make it difficult to locate where he was

6   living, that at various points he was not, in fact,

7   living in New York, that he had traveled internationally,

8   and that he was researching essentially when he believed

9   he was under investigation, and there was a risk that he

10  was going to be arrested, that he was researching how to

11  escape and how to avoid both being caught by law

12  enforcement and also how he could travel without being

13  detected by law enforcement.

14          THE COURT:  Where was he arrested?

15          MS. KOSTOPOULOS:  He was arrested here in New

16  York, Your Honor.

17          THE COURT:  Where?

18          MS. KOSTOPOULOS:  He was arrested I believe at

19  the residence associated with his girlfriend.  And so I

20  believe that law enforcement was surveilling the

21  location, the residence that they had identified and

22  ultimate identified him.

23          THE COURT:  And the indictment was issued

24  relatively recently, right?

25          MS. KOSTOPOULOS:  I'm sorry?

1                         PROCEEDINGS                19

2             THE COURT:  The indictment was issued relatively

3    recently?

4             MS. KOSTOPOULOS:  It was, Your Honor, it was

5    issued earlier this month I believe.  Perhaps a week ago.

6             THE COURT:  Were there efforts to arrest him

7    that came to naught because he was difficult to find?

8             MS. KOSTOPOULOS:  I'm not aware of whether

9    between the time that an arrest warrant was issued and

10   the arrest that ultimately was conducted today law

11   enforcement took other steps, but what I do know is that

12   when law enforcement, as I represented to Your Honor

13   based on my conversations with the Middle District of

14   Florida and with the arresting agent, at points when they

15   were attempting to detect where the defendant was living,

16   what his pattern of life was, his bank account activity,

17   his DMV records, his vehicle, all of these markers that

18   would allow him to be more easily detected and

19   identified, each of these had essentially been erased

20   from the defendant's public identity.  He had sold his

21   car, he had moved his bank accounts into various forms of

22   cryptocurrency, essentially making it more difficult for

23   him to be found by law enforcement, and, frankly, Your

24   Honor, precisely in line with the searches that law

25   enforcement identified that the defendant was running in

1                              PROCEEDINGS                    20

2  2020 when these charges or at least this investigation

3  first became public.

4          The difference, Your Honor, and I know, you

5  know, we're talking about searches that occurred in 2020,

6  there's a significant difference now.  The defendant has

7  been arrested.  He's been charged with extremely serious

8  criminal charges that face very significant penalties.

9  And as the photographs before Your Honor demonstrate,

10  this is for smuggling hundreds of rounds of ammunition

11  out of the country, military grade equipment out of the

12  country, assault style rifles out of the country.  And so

13  not only does that demonstrate access to firearms and

14  knowledge of firearms, it also demonstrates that the

15  facts now have changed.  We're not talking about the

16  hypothetical where the defendant is researching, you

17  know, what countries he can flee to or what countries he

18  can seek asylum to; the reality is he is now facing

19  extremely serious penalties, and that's precisely the

20  type of risk of flight that the evidence in this case

21  demonstrates is more likely than not, that's the

22  evidence, that's the burden that the Government bears in

23  terms of showing that there is a risk of flight here for

24  this particular defendant.

25          I think, Your Honor, two, maybe three other

```
 1                          PROCEEDINGS              21

 2   points to quickly, to conclude on in terms of the danger

 3   to others and, frankly, just the danger writ large in the

 4   offense conduct here.  One, this crime involved weapons.

 5   There were weapons that were being procured and illegally

 6   smuggles out of the country by the defendant in order to

 7   support an armed incursion against a foreign government.

 8   That is intrinsically violent conduct that the defendant

 9   was seeking to engage in and that he was taking steps to

10   participate in and facilitate others' engagement in.

11           Second, access to weapons, and I think

12   specifically, Your Honor, here, some of the search

13   history from the same time period when the defendant was

14   searching how he could exit the country without being

15   seen by law enforcement, some of the searches he was

16   running, how to get a pistol through a metal detector, X-

17   ray scanner hide pistol images.  Hide pistol X-ray.  Is

18   it possible to sneak a gun through airport security?

19   These are precisely the kinds of searches that

20   demonstrate that the defendant had access to firearms and

21   that he can't be trusted, frankly, to abide by a court

22   order as Pretrial has recommended that he not continue to

23   possess firearms or use firearms, if for some reason he's

24   released on conditions.

25           THE COURT:  Was he prohibited from possessing a
```

1

2    firearm?

3          MS. KOSTOPOULOS:  He's not, Your Honor, but I

4    believe that that's one of the conditions that Pretrial

5    is noting.  It's not that the defendant is prohibited

6    from having a firearm whatsoever; the bigger concern is

7    that in taking steps to evade law enforcement and

8    Googling how or searching for how he could evade law

9    enforcement, he was also searching about how he could

10   conceal a weapon illegally and travel through airport

11   security or get on a bus to Mexico without it being known

12   that he was carrying a firearm that he would not have

13   been permitted to travel with, for example, passing

14   through an airport.  That's what I think is implicit in

15   the searches the defendant seems to have been running at

16   the same time that he was searching for countries to flee

17   to and how to be a, how to essentially become a fugitive.

18         The final note, Your Honor, that I think weighs

19   heavily in favor of detention here, obviously the primary

20   basis that we're arguing for is risk of flight.  I've

21   highlighted some of the danger to the community and just

22   general danger that's sort of part of the offense conduct

23   here and part of the charges against the defendant.  The

24   final thing I think to note is that part of the

25   allegations against the defendant and my understanding

1                          PROCEEDINGS                    23

2    from speaking to the Middle District of Florida is that

3    the defendant has, since the investigation became public

4    or at least since it was in the press, tried to contact

5    at least one witness in connection in this investigation

6    and essentially coach that witness on what to say if

7    approached by law enforcement and specifically advised

8    the witness to lie to law enforcement if the, if law

9    enforcement were to reach out to this individual and ask

10   about his involvement in this, in these charges, in this

11   particular case.

12           And so that weighs heavily under the 34, 3142(f)

13   factors and specifically the risk that a person will

14   obstruct or attempt to obstruct justice.  There's a risk

15   that the defendant will flee, he was taking active steps

16   to research how to flee, he was taking active steps to

17   evade law enforcement after he believed, I think, that he

18   was in the clear and that he was no longer under

19   investigation, and he's also taken steps to contact

20   witnesses in connection with the investigation.  And for

21   all those reasons, Your Honor, we believe detention --

22           THE COURT:  You just said witnesses.

23           MS. KOSTOPOULOS:  Witness, excuse me, singular.

24   One witness in connection with this investigation.  And

25   so for all of those reasons, Your Honor, we believe

1                          PROCEEDINGS                    24

2    detention is necessary here and that no condition or

3    combination of conditions will both assure the

4    defendant's continued presence in connection with this

5    case, will prevent him from fleeing, will adequately

6    protect the community, and will avoid the concerns

7    regarding obstruction of justice and witness tampering.

8              THE COURT:  The indictment charges a conspiracy

9    ending I guess in around March of 2020.  Is that when the

10   incursion happened?

11             MS. KOSTOPOULOS:  I believe - one moment, Your

12   Honor, I can check with the case agent.  I believe it

13   happened sometime in 2020.  I'm not sure of the exact

14   month.  I believe it was in May 2020 which is also when

15   many of these searches were being conducted after the

16   incursion.

17             THE COURT:  Searches of his internet history?

18             MS. KOSTOPOULOS:  Yes, so I believe that the

19   timeline was smuggles weapons out of the country,

20   participate in this, you know, failed incursion in

21   Venezuela that led to several deaths and several being

22   imprisoned, and then there began to be press coverage

23   about the incursion and the defendant's role in it, and

24   specifically that the defendant may have been one of the

25   people who smuggled this military equipment out of the

```
 1                          PROCEEDINGS                25
 2  country, and that's when we start to see sort of lengthy
 3  - I have them here, Your Honor, I mean it's pages and
 4  pages of searched where the defendant is looking at news
 5  of the coverage and searching for how to flee the country
 6  and countries to seek asylum in.
 7            THE COURT:  In 2020?
 8            MS. KOSTOPOULOS:  In 2020, yes.
 9            THE COURT:  And do you have any indication that
10  he's continued to engage in the same or similar criminal
11  conduct as what's alleged in the indictment since May of
12  2020 or other criminal conduct?
13            MS. KOSTOPOULOS:  I have no evidence one way or
14  another, Your Honor.  Again, you know, we're sort of
15  relying on the proffers and the, both the proffers from
16  the Middle District of Florida and the charges that are
17  outlined here.  I have no evidence one way or another of
18  whether there's been any, both ongoing involvement or
19  whether there's been investigation or if the
20  investigation is ongoing.
21            THE COURT:  Thank you very much.  Ms. McCrae.
22            MS. McCRAE:  Yes, Your Honor, so we do believe
23  that there are conditions that can be fashioned here for
24  releasing Mr. Goudreau.  I think as the Court is
25  gathering and the Government has put forth, this case has
```

PROCEEDINGS                    26

1

2    a lengthy history, there's a lot going on here, extremely

3    highly publicized incident that happened in Venezuela

4    that Your Honor may remember himself.  I can fill the

5    Court in a little bit more on what's been happening on

6    Mr. Goudreau's side since the media coverage surrounding

7    this case in 2020 arose.

8         Mr. Goudreau had, he did retain private counsel

9    in Florida in connection with the investigation in this

10   case.  He knew that he was under some sort of

11   investigation.  I did have a chance to speak with his

12   retained counsel earlier today.  I can give the Court

13   that person's name if the Court would like.

14        THE COURT:  Sure.

15        MS. McCRAE:  His name is Gustavo Garcia- Montes.

16   He's a Miami-based lawyer.  And there was extensive

17   communications with the Government, agents, and I believe

18   even the U.S. Attorney's Office at the time.  There was a

19   scheduled meeting with the FBI that Mr. Goudreau had

20   consented to.  It was apparently scheduled for a Friday.

21   He was planning to attend it.  And then on a Thursday the

22   agents decided to execute a warrant on him and decided

23   not to proceed with that meeting.  Despite that --

24        THE COURT:  When was that, do you know, like the

25   year?

```
 1                         PROCEEDINGS                    27
 2              MS. McCRAE:  That was in 2020, but I don't know
 3    more precise than that.  And subsequent to that he,
 4    nevertheless, at the request of the Government,
 5    voluntarily turned over a phone that I believe they have
 6    and they have searched.  He has stayed in touch with
 7    private counsel; private counsel has continued to be
 8    available to work on this case.  And essentially, after
 9    events of the early part of this investigation died down,
10    he waited, and he didn't hear anything, and nothing else
11    happened.
12              Since then, about two and a half years ago, it's
13    correct that he relocated to New York, and he's been
14    living in Manhattan with his partner at the same address
15    for the entire time.  He has been attending film school
16    here in New York.  He has been attending the --
17              THE COURT:  Enrolled in his own name?
18              MS. McCRAE:  I'm sorry?
19              THE COURT:  Enrolled in his own name?
20              MS. McCRAE:  All in his own name, yes, correct,
21    Your Honor.  And I should add, Your Honor, the military
22    is paying for him to go to school.  He's also collecting
23    a military pension.  He attends a VA here for medical
24    treatment.  I think the Court may be aware he's military,
25    he's a retired, I believe he was Special Forces before he
```

1                                    PROCEEDINGS                    28

2  was medically retired.  He suffers from quite a few

3  injuries from his time in combat, and I can list some of

4  those for the Court, but they include, you know, a TBI

5  from blast injury, multiple gunshot wounds, multiple stab

6  wounds, PTSD.  So there are substantial medical concerns

7  for which he's been receiving regular treatment from the

8  VA here in Manhattan, and I point that out so the Court

9  can see just how openly he's been living.

10         And like I said, he's been living at the same

11  address with his partner where he was arrested today.  So

12  there's no indication whatsoever that he's not living an

13  open life.

14         I should also add he frequently travels back to

15  Florida to, yeah, Tampa where he often resides, and when

16  he's in Florida, he lives on a boat that is docked at an

17  air force base.  In order to get on and off the base, he

18  shows an ID, he comes on and off the base.  He frequently

19  flies back and forth to Florida using his own ID.

20         You know, the Government made several

21  representations about him going to Mexico and somehow

22  suggesting that was surreptitious.  You know, Mr.

23  Goudreau has not traveled much in the last five years,

24  but I understand he did travel to Canada last year to see

25  his mother who was gravely ill, and she did, in fact,

PROCEEDINGS                    29

1
2    pass away.  He did that using his own name.  He obviously
3    came back into the country, and for that matter all these
4    trips he came back into the country.

5          So what I'm trying to get at here, Your Honor,
6    is he's been living openly, absolutely no effort to
7    conceal where he's at and his identity who he is.  He's
8    very much on the military's radar because he's attending,
9    you know, school on the GI bill and going to the VA for
10   medical treatment.

11         Your Honor, he – my understanding is this case
12   was indicted about two weeks ago, and neither Mr.
13   Goudreau nor his lawyer can tell us why it was indicted
14   when it was indicted.  Our best guess is that the
15   Government is nearing its statute of limitations.  I
16   should add, by the way, the private counsel informed me
17   that when this case began it began as a FARA
18   investigation.  So the nature of it was a little bit
19   different, but I recognize the charges before the Court
20   are not FARA charges.  But he was indicted two weeks ago.
21   He was not told he was indicted.  It's not though anyone
22   called him or his lawyer and gave him an opportunity to
23   appear in Tampa which he certainly would have done.

24         You know, I think it's significant for the Court
25   to know his co-defendant was apparently given that

1                                PROCEEDINGS                      30

2  opportunity.  She was notified and told to appear.  So to

3  the extent that the nature of the charges or the amount

4  of his jail exposure here and of itself a flight risk.

5  You know, the Government apparently didn't see that to be

6  the case with the co-defendant.

7           So, you know, based on the fact that he's

8  retained counsel, he was historically very cooperative on

9  this case, he's been living openly, I just, I really

10 don't see how the Government can make out flight risk.

11          Your Honor, a couple of other things, you know,

12 we're definitely not here to litigate the substantive

13 allegation, and I would not attempt to do that, but, you

14 know, basic media coverage, like sort of Google searching

15 about the incident back when this happened, one thing I

16 want the Court to be aware of is there was a request for

17 extradition from Venezuela shortly after this happened

18 for Mr. Goudreau, which I understand the U.S. government

19 ultimately declined to honor, they did not, as the Court

20 can perfectly well see, extradite him at Venezuela's

21 request.  But I think that goes to why he may have been

22 done some searches about, for example, asylum in

23 countries and things like that.

24          But as the Court has pointed out, his search

25 history is now, you know, well over four years old.

```
 1                         PROCEEDINGS              31

 2   There's no indication whatsoever that he's done anything

 3   to even remotely try to flee or evade detection by the

 4   U.S. government.  If I could just have a moment.

 5             (pause in proceeding)

 6             MS. McCRAE:  Your Honor, I will say that he,

 7   like I said, he lived with his partner for two and a half

 8   years.  She is here in the courtroom, here in the second

 9   row.  You know, I think this is the kind of case where I

10   don't think detention is appropriate given everything

11   that's happened in the last few years.  If the Court

12   detained him, he would go to MDC which we all know is not

13   a good place, particularly if someone needs medical care

14   of any kind.  And it might --

15             THE COURT:  Temporarily.

16             MS. McCRAE:  I'm sorry?

17             THE COURT:  Quite temporarily.

18             MS. McCRAE:  Well, I'm about to address that.

19   In my experience he could sit there for weeks waiting

20   transfer to the Middle District of Florida or the Court

21   could release him and tell him to appear on Friday, and

22   he would do that.  And I think there's no reason to think

23   he wouldn't, and there's no reason to think the Court

24   can't fashion, you know, conditions that would make that

25   possible.
```

```
 1                         PROCEEDINGS                 32

 2              He has a place to go, he has the place he's been

 3    living.  If the Court wants him to be under detention

 4    there until he gets, you know, on a plane to Florida,

 5    that can be arranged.  We also are able to sign a bond.

 6    His partner who's in the courtroom has indicated to me

 7    that she owns outright an apartment.  It's valued at $2

 8    million, Your Honor, and that is something that she would

 9    be willing to --

10              THE COURT:  Equity of 2 million?

11              MS. McCRAE:  My understanding, yes.  Post as a

12    guarantee that Mr. Goudreau would not flee.  And I

13    understand given the nature of a 5(c)(3) that it requires

14    traveling to Florida, perhaps a high bond is more

15    appropriate than like something like home detention

16    because the whole idea is that he goes to Florida.

17              So, you know, I think that the Court, given that

18    he has a cosigner who's willing to sign, he, you know,

19    has a place that he routinely stays which is the boat

20    that's on the Air Force base in Florida, and the fact

21    that he can just get on a plane and go there himself

22    rather than waiting in, you know, frankly, an appalling

23    jail while the Government seeks to transfer him which can

24    take a very long time is a more appropriate course of

25    action given that he's just been living openly here for
```

```
 1                         PROCEEDINGS              33
 2  the last few years.  If I could just have one moment.
 3           THE COURT:  Any other individual you've
 4  identified as potential cosigners?
 5           MS. McCRAE:  No, Your Honor, not at this time.
 6  Although, of course, Mr. Goudreau himself can sign, and
 7  he does earn money.  Well, actually it's about $10,000 a
 8  month right now from the military that he's reported to
 9  Pretrial.  That's a combination of his retirement
10  disability benefits and income he receives as being a
11  student on the GI bill.
12           THE COURT:  Is there anyone else who has, in the
13  United States who has some degree of moral suasion,
14  family member, something like that?
15           MS. McCRAE:  I can ask, Your Honor.  If you want
16  to give me a moment.
17           THE COURT:  Sure.
18           MS. McCRAE:  I'm not sure we'd be able to like
19  rustle up their names right now in real time, but I can
20  certainly ask Mr. Goudreau.  But, again, this isn't the
21  kind of case where we're seeking an unsecured bond.  This
22  is --
23           THE COURT:  Understand.
24           (pause in proceeding)
25           MS. McCRAE:  We have at least one good friend
```

1                          PROCEEDINGS                    34

2   who we're quite confident would sign.  He's one of his

3   oldest friends from the military.  He resides in

4   (indiscernible) so we would have to touch base with him

5   to coordinate with the U.S. Attorney's Office.  And,

6   again, you know, any other conditions the Court imposes

7   including, you know, sending Pretrial his itinerary.  If

8   Pretrial is okay with it, he could be on an ankle monitor

9   and surrender the ankle monitor to Pretrial in Florida.

10  You know, whatever the Court would want as security, I

11  just think he could get himself there much more safety

12  and much more quickly and much more in compliance with

13  the Bail Reform Act if he were released.

14          THE COURT:  Thank you.  Anything further from

15  the Government?

16          MS. KOSTOPOULOS:  Yes, Your Honor, just briefly,

17  a couple of points.  I think, first, the statement by

18  defense counsel that, you know, once the defendant became

19  aware that there might be in an investigation against him

20  or involving him in 2020, he just waited and lived

21  openly, that's not correct, Your Honor, that's not

22  accurate.  I think the internet searches demonstrated

23  that that's not what the defendant was doing, that he was

24  taking steps to research what he should do if he became

25  aware of the fact that law enforcement would try to

```
 1                        PROCEEDINGS                    35
 2  either bring charges against --
 3            THE COURT:  How do you know about those, by the
 4  way?  Is that from searching the cellphone that he
 5  surrendered voluntarily?
 6            MS. KOSTOPOULOS:  I'm not sure where - I can
 7  check with the case agent where these searches came from,
 8  Your Honor, but my understanding is that they're either
 9  associated with his electronic accounts or I believe
10  devices that were collected in connection with this
11  warrant that was mentioned by defense counsel in 2020.
12  So which of the two these specific searches came from I'd
13  have to confirm, but the searches I think demonstrate
14  precisely what animates the Government's application for
15  detention here which is not that this was some sort of
16  hypothetical or a one-off search that the defendant
17  engaged in but that there were repeatedly dozens of
18  searches that the defendant was conducting about how to
19  live off the grid, what countries he could flee to, how
20  he could avoid law enforcement, what happens if he runs
21  from the law, I mean --
22            THE COURT:  But he didn't do that, and I have to
23  consider, if there are conditions that can address that
24  risk of flight to whatever extent it exists, I am
25  obligated to impose those conditions rather than detain
```

1                           PROCEEDINGS                    36

2   this gentleman.

3          MS. KOSTOPOULOS:  I recognize that, Your Honor,

4   but I think that the key factor here, what has changed is

5   that the defendant has now been charged, and so this is n

6   longer the hypothetical risk of charges, the hypothetical

7   investigation that was being reported in the news.  These

8   are actual criminal charges where the defendant is facing

9   as a maximum penalty between 10 and 20 years in prison.

10  And those are precisely the types of penalties that the

11  defendant presumably was considering how he would evade

12  when he was searching what countries he could flee to or

13  how he could leave the country without being detected by

14  law enforcement.

15          And some of those searches, frankly, Your Honor,

16  I think, you know, there's some lack of clarity here

17  about where the defendant has been living, and I think

18  this is sort of belied by defense counsel's proffer, you

19  know, our understanding is that certainly that he owns a

20  boat in Florida that he uses to travel, that he was

21  living at least part time in New York, but it sounds like

22  he was living in Florida as well.  He has very limited

23  ties to the community in terms of individuals who can

24  actually exercise moral suasion over him here in New

25  York, here in the Southern District to make sure that he

1                              PROCEEDINGS                    37

2    actually travels to the Middle District of Florida.  And,

3    frankly, Your Honor, even the reference to the sailboat,

4    I mean one of the searches the defendant was running was

5    can I take a boat with no passport?  What happens if I

6    run from the law?  I mean these are precisely the types

7    of tools that the defendant was thinking about and

8    seeking to use in order to evade law enforcement when he

9    believed that he was about to be imminently arrested.

10   The press coverage of that event changed, there was no

11   longer sort of coverage about the event, and he started I

12   think to believe that he was no longer at risk of being

13   charged and arrested.  But now those facts have changed

14   on the ground, Your Honor, and that's a significant

15   factor weighing in favor of detention here.

16             He's shown that he is sort of interested and

17   willing to research how to take steps to evade law

18   enforcement, and that's a very significant step forward

19   now that he's actually been charged.

20             THE COURT:  Well, he wouldn't be here if he

21   wasn't charged.

22             MS. KOSTOPOULOS:  Here in this courtroom.

23             THE COURT:  Yes.

24             MS. KOSTOPOULOS:  Absolutely, Your Honor.  I

25   recognize that, you know, and I do think on that note --

```
 1                          PROCEEDINGS                  38
 2            THE COURT:  The existence of charges I suggest
 3   can't have such a big impact as you suggest.
 4            MS. KOSTOPOULOS:  I think, Your Honor, though --
 5            THE COURT:  I can't view it that way at least.
 6            MS. KOSTOPOULOS:  Sure.  I think that the point
 7   though that I'm trying to make is the following.  When
 8   the defendant did not know that he was about to be
 9   charged and only knew of the existence of a potential
10   criminal investigation involving his illegal conduct, he
11   was taking extensive efforts to research what he should
12   do in order to evade law enforcement and flee the
13   country.  Those charges didn't come to fruition at that
14   time.  Apart from illegally traveling to Mexico, as we've
15   proffered to the Government, he has otherwise, as we
16   understand it, largely stayed within the United States,
17   but what's changed now is that that's no longer, that's
18   no longer a hypothetical --
19            THE COURT:  But what will also change is that,
20   if I decide to release him, he will be under significant
21   conditions.
22            MS. KOSTOPOULOS:  But our argument, Your Honor,
23   is that no combination of conditions, given that there's
24   evidence here that the defendant was able at least once
25   to illegally leave the country, travel over the border to
```

PROCEEDINGS                    39

Mexico, and return without being checked by customs,

without being registered at the border, and that he was

researching precisely how to do that at the time that we

believe the travel took place, that's a significant step

forward to actually evading law enforcement, and it shows

that he has the means and the ability to do so.

THE COURT:  Anything else?

MS. KOSTOPOULOS:  No, Your Honor.

THE COURT:  All right.  I've listened very

carefully to the arguments of both sides.  I've also

carefully read the Pretrial Services report which does

recommend release based on a number of conditions set

forth therein.  And I believe that there are conditions

that I can impose that will in combination reasonably

assure Mr. Goudreau's appearance in court which is the

principal argument on behalf of the Government but also

will protect the safety of other persons in the

community.

I don't believe the Government has met its

burden of showing that Mr. Goudreau is a, either a

significant risk of flight or danger to the community or

presents a danger of engaging in obstructive conduct that

cannot be sufficiently addressed by conditions on his

release, which will be significant.  But this is not a

```
 1                          PROCEEDINGS                 40
```

 2   presumption case.  There's no mandatory minimum although

 3   the charges are quite serious, and I'm sure Mr. Goudreau,

 4   if convicted, faces some significant time in prison.  But

 5   he has – that conduct ended a number of years ago.

 6   There's no evidence before me that he's engaged in any

 7   additional criminal conduct before then or after then.  I

 8   apologize, it's difficult for me to assess the weight of

 9   the evidence to be honest.  I appreciate the Government

10   lawyer's filling in some of the record which is not

11   evident, of course, from reading the indictment, but,

12   nevertheless, I don't view that factor as compelling

13   detention in this case.

14          Mr. Goudreau I believe has no criminal history.

15   He's been here in the United States for a long time.  He

16   has a long-time relationship.  There are financial

17   conditions that I intend to impose that should further be

18   a very significant disincentive for him to violate those

19   conditions because in so doing he would be hurting

20   people, at least among the people he holds most dear.

21          I've listened carefully to the Government's

22   proffer about search history from 2020.  It is a concern,

23   and it will result in the imposition of conditions at

24   least by me that I would not otherwise have imposed, but

25   given that that was many years ago and from everything

```
 1                          PROCEEDINGS                    41
 2   the Government has said and from Mr. Goudreau's presence
 3   here today, he did not act on whatever thoughts he had
 4   back then that may be gleaned from those searches.  He
 5   has, as has been represented to me, he's cooperated with
 6   law enforcement.  He has lived openly.  I'm not persuaded
 7   by the Government's somewhat I thought obscure and vague
 8   insinuations that he has been trying to hide in recent
 9   years.  It sounds like the Government had no difficulty
10   in finding him once an arrest warrant was issued.  He's
11   been using his own name.  There was I believe zero
12   evidence proffered to me that he's used any aliases or
13   anything of that nature.
14            Although the crime is certainly involves
15   violence on a very tall order, there is no indication
16   either from the circumstances of those offenses or
17   anything else in Mr. Goudreau's records that suggests he
18   has been a danger to anybody here in this community or in
19   the United States as far as the record appears to me at
20   least.  And that's not in any way to minimize the
21   seriousness of arms smuggling and export violations if
22   that conduct was engaged in, but obviously Mr. Goudreau
23   will need to remain here, addressing the dangerousness
24   issue now.  He will need to remain in the United States.
25   So, and as I said, I don't think he poses a significant
```

1                              PROCEEDINGS                    42

2   threat to anybody in terms of dangerousness in the United

3   States, and he won't be in a position to pose a threat

4   to, a significant threat to anybody outside of the United

5   States.

6            So for all those reasons I am going – and let me

7   just say I believe that under the law I'm required to

8   release him because I believe there are conditions that

9   will assure the safety of the community and his

10  appearance at future court proceedings, but obviously

11  once he arrives in the Middle District of Florida, that

12  issue will be revisited, Mr. Goudreau, and the good

13  judges down there may have a different point of view.

14  Maybe another fight.  I can only call it the way I see

15  it, and the way I see it, there are conditions that I can

16  impose.  Those conditions are as follows:

17           Mr. Goudreau must sign a $2 million bond.  That

18  is to be cosigned by two financially responsible persons

19  and secured by the apartment – apartment? – owned by his

20  girlfriend.  I think we have her name please.

21           MS. McCRAE:  Your Honor, may I (indiscernible).

22  I'm happy to approach and tell the Government at least

23  written in a report.  I would just rather not be on the

24  public record.

25           THE COURT:  Uh huh, well.

```
 1                          PROCEEDINGS                    43

 2                 (pause in proceeding)

 3             MS. McCRAE:  It's not in the Pretrial report.

 4   I'm happy to tell the Court what it is.

 5                 (pause in proceeding)

 6             MS. McCRAE:  Your Honor, I'm not sure – her name

 7   and number were certainly shared with Pretrial.  Perhaps

 8   they did not include it in the report.  Oh, yes, it is

 9   there, Your Honor, it's on page 2, second paragraph from

10   the bottom, second to last line.

11                 (pause in proceeding)

12             THE COURT:  Okay, I see it.  I can't make any

13   promises about keeping her name out of the public record

14   though.  Obviously, if she's going to be a cosigner.

15             MS. McCRAE:  Would Your Honor be willing to make

16   it so that the partner signs it but the second signer is

17   moral suasion.  I'm just not sure, I'm concerned about

18   the amount of money, whether the second person would be

19   approved as a cosigner given the amount.  Like it's a

20   secured bond with respect to his partner's apartment, but

21   a lot of cosigners would not get approved at that amount.

22   So for the second cosigner --

23             THE COURT:  Well, in my view that is a moral

24   suasion person, that's what that person brings to the

25   table.
```

```
 1                        PROCEEDINGS              44

 2            MS. McCRAE:  Then perhaps we could just clarify

 3   it's to be signed by Mr. Goudreau and his partner and

 4   secured by her apartment and then another cosigner who's

 5   a moral suasion --

 6            THE COURT:  Yes.

 7            MS. McCRAE:  We just clarify that those are the

 8   terms.  I'm just not --

 9            THE COURT:  Yes, but they'll be signing a $2

10   million bond.

11            MS. McCRAE:  Okay.

12            THE COURT:  But from my standpoint and for

13   whatever it's worth in terms of the Government's

14   consideration of that person, you know, I believe that

15   that person has the requisite degree of moral suasion

16   having the financial wherewithal to cough up 2 million

17   bucks is not necessary.

18            MS. McCRAE:  I just want to be in a position

19   where they can't get approved for a bond of

20   (indiscernible).

21            THE COURT:  Mr. Goudreau is to be subject to

22   Pretrial Services supervision as directed.  Travel is

23   restricted to the Southern District of New York and the

24   Eastern District of New York.  Obviously, that is subject

25   to his not only ability but obligation to travel to the
```

```
 1                        PROCEEDINGS                45
 2   Middle District of Florida for court appearances and
 3   places in between that it's necessary to get to the
 4   Middle District of Florida.  He shall surrender all
 5   passports or other travel documents and make no new
 6   applications for passports or travel documents.  I am
 7   going to order home detention with GPS monitoring or
 8   monitoring as decided by Pretrial Services.
 9            PRETRIAL SERVICES:  Yes, Your Honor, we would
10   recommend as directed --
11            THE COURT:  As directed by Pretrial Services.  I
12   defer to my friends in Pretrial Services.
13            MS. McCRAE:  I'm sorry, so that's not home
14   detention?
15            THE COURT:  No, that is home detention.  And,
16   again, obviously my role here is perhaps of an interim
17   nature.  That may be revisited by the Middle District of
18   Florida and perhaps (indiscernible) depending on if Mr.
19   Goudreau seeks that, and a court approves it.  But I
20   believe that at least for present purposes home detention
21   is warranted.
22            Mr. Goudreau is to continue with his educational
23   program.  He shall submit to an initial urinalysis, and
24   if that is positive, he will be subject to drug testing
25   and treatment as directed by Pretrial Services.  He will
```

1                                    PROCEEDINGS                        46

2      be subject to mental health evaluation and treatment as

3      directed by Pretrial Services.  He is to have no contact

4      with codefendants or any witnesses in this case unless in

5      the presence of counsel.  Okay?  That means no contact of

6      any nature, not just contact about the case, no contact

7      with witnesses or codefendants or alleged coconspirators

8      in this case.

9               He is to refrain from possessing any form of

10     firearm, destructive device, or any other dangerous

11     weapon, and – (pause) – I will require these conditions

12     to be met prior to his release, including the posting of

13     the apartment.  So that means, Mr. Goudreau, that you

14     will not be released today because there's no way that

15     that could happen today.  Okay?

16              MS. McCRAE:  Would the Court reconsider that

17     portion?  I mean he would report here first thing.  I

18     understand the time of day and that's the problem that

19     we're having, but I think --

20              THE COURT:  Well, it's not just the time of day.

21     It may take some time to get the other cosigner in to

22     post the property.  Pretrial has recommended that these

23     conditions must be met before he is released, and I am

24     accepting that recommendation.  And, of course,

25     encouraging the Government, as I would expect in any

```
 1                              PROCEEDINGS                    47
 2   event, to cooperate fully and promptly with whatever it
 3   needs to do to enable Mr. Goudreau to satisfy those
 4   conditions.
 5              (pause in proceeding)
 6              THE COURT:  Anything further on the conditions
 7   of release?
 8              MS. McCRAE:  Nothing from me, Your Honor.
 9              MS. KOSTOPOULOS:  Nothing on the conditions of
10   release, Your Honor.  I think we have one further point
11   we'd want to make, but I don't want to interrupt the
12   Court if you're outlining additional conditions or had
13   other items you wanted to address.
14              THE COURT:  I was done with outlining the
15   conditions, so go ahead.
16              MS. KOSTOPOULOS:  So I recognize that this may
17   be in part mooted, Your Honor, by the Court's order that
18   the defendant be required to satisfy the conditions prior
19   to being released, but the Government would also
20   respectfully request a 24-hour stay in order to give the
21   Government an opportunity to consider whether, and I
22   believe specifically to give the Middle District of
23   Florida time to consider whether or not there are any
24   additional steps they wish to take in light of Your
25   Honor's rulings regarding the conditions of the
```

1                           PROCEEDINGS                    48

2   defendant's ultimate release.

3           THE COURT:  I really do think it's moot, which

4   you could say cuts in favor of granting that request as

5   well because I don't think it'll make a difference.  Do

6   you have a position, Ms. McCrae?

7           MS. McCRAE:  Your Honor, I would ask the Court

8   to deny that motion and also because I don't understand

9   the Bail Reform Act authorizes stay on a bail position.

10  That's usually why we go straight to Part 1 the day of

11  when the Government seeks to appeal here.  You know, it

12  is moot, so that's also a strong argument for the Court

13  not needing to reach that argument as well as for just

14  denying it.  But, you know, if the U.S. Attorney in

15  Florida wants to go to a district court judge and

16  (indiscernible) they can do that while we're getting a $2

17  million bond signed, I don't see any reason for the Court

18  to grant a stay here though.  And I don't believe there's

19  any authority for the Court to do that.

20          MS. KOSTOPOULOS:  I think, Your Honor, first,

21  obviously there are sort of a number of examples in this

22  district where stays are authorized precisely to permit

23  the Government time to consider whether or not an appeal

24  is warranted for conditions that are being set by the

25  Court.  But I think, more to the point, as I acknowledged

1                          PROCEEDINGS                    49

2   when I made the application, it really is just belt and

3   suspenders in order to give, given that this prosecution

4   is happening outside of our district, that district time

5   in order to bring an application to the district court in

6   the Middle District of Florida in the event that the

7   defendant were somehow to satisfy the conditions of his

8   release within 24 hours.  And, again, we would, you know,

9   we'll take the steps that we're directed to do in terms

10  of making it possible for him to begin meeting those

11  conditions, but the stay is really designed as belt and

12  suspenders to give the Middle District of Florida time in

13  the event those conditions were met.

14          THE COURT:  All right, I'll grant a stay to the

15  close of business tomorrow.

16          MS. KOSTOPOULOS:  Thank you, Your Honor.

17          THE COURT:  Which arguably is less than 24

18  hours.  All right, now, Mr. Goudreau, I need to warn you

19  that if and when you are released and you fail to appear

20  in court, whether it's here or more likely in the Middle

21  District of Florida, as required or if you violate any of

22  the conditions that I just set forth, a warrant will be

23  issued for your arrest.  You and anyone who signed this

24  bond will be responsible for the full amount of the bond,

25  that is, $2 million.  And on top of that you could be

1
2   charged with a crime of bail-jumping.  And there's
3   another consequence as well.  If you were to commit a new
4   offense, a new crime while you were on release in this
5   case, in addition to whatever punishment you might
6   receive for that hypothetical new crime, you would be
7   subject to enhanced punishment in this case of an
8   additional term of imprisonment of not more than ten
9   years if that new offense was a felony and not more than
10  one year if it was a misdemeanor, and that term of
11  imprisonment would run consecutively, in other words, on
12  top of any sentence of imprisonment you get in the case
13  in which you have been charged in the Middle District of
14  Florida.

15          Is there a date we should set for Mr. Goudreau's
16  appearance in the Middle District of Florida?

17          MS. KOSTOPOULOS:  I don't believe that a date
18  has been set yet in the District, Your Honor, so we could
19  set 30 days as the control date or whatever the Court
20  prefers.

21          THE COURT:  Okay.  I'll set 30 days as a control
22  date.  Well, you want 30 days or you want more like 14
23  days?

24          MS. KOSTOPOULOS:  I think it really depends,
25  Your Honor, on whether or not the defendant is released

```
 1                              PROCEEDINGS                    51
 2  or whether or not he continues to be detained.  I think
 3  typically the control date is just the point at which the
 4  parties report to the court if the defendant, assuming
 5  he's detained, has not been transported to the district
 6  that's prosecuting him or if he's been released, then the
 7  District of Florida will set a date at which time they
 8  would want him to be seen.  So from our perspective --
 9            THE COURT:  It's just a control date.
10            MS. KOSTOPOULOS:  Exactly.
11            THE COURT:  All right, I'll set a control date
12  30 days out, which is August 29, 2024.  That's a control
13  date for you to appear in the Middle District, but,
14  again, it's a control date meaning it undoubtedly is
15  going to be superseded by events including whenever the
16  Middle District of Florida wants you to appear down
17  there.  Okay?  Is there an application needed or sought
18  with regard to the Speedy Trial Act?
19            MS. KOSTOPOULOS:  No, Your Honor, the time is
20  excluded under the Speedy Trial Act given that the
21  defendant is currently outside of the district and has
22  not yet traveled to the district that is prosecuting him.
23            THE COURT:  Okay, very well.
24            MS. McCRAE:  Your Honor, may I just make one
25  brief application?
```

| 1 | PROCEEDINGS                                     52 |

2          THE COURT:  Yes.

3          MS. McCRAE:  This is not even remotely to cast

4    aspersions on Ms. Kostopoulos.  I've had a couple of

5    situations recently where conditions needed to be met in

6    order for a client to get out, and the U.S. Attorney's

7    Office assigned a paralegal to the case who was sort of

8    out of the office for a couple of days.  So we weren't

9    able to schedule the interviews.  So I'm just going to

10   politely ask if --

11         THE COURT:  I already addressed that with her.

12   I'm not going to address it again.

13         MS. McCRAE:  No, I understand but just so that

14   there's been an administrative delay a couple of times on

15   these cases.

16         THE COURT:  I've already talked to the Assistant

17   U.S. Attorney about my expectation that the Government

18   will cooperate in promptly doing whatever it needs to do

19   to ensure that Mr. Goudreau can satisfy the conditions.

20   There's – you may not have heard that.  You might've been

21   talking to your client.

22         MS. McCRAE:  I did (indiscernible), Your Honor.

23         THE COURT:  But I'm not repeating that.

24   Anything further from the Government?

25         MS. KOSTOPOULOS:  No, not from the Government,

```
 1                        PROCEEDINGS                    53

 2   Your Honor, thank you.

 3            THE COURT:  Anything --

 4            MS. McCRAE:  No, Your Honor, I just to get

 5   (inaudible).

 6            THE COURT:  Okay.

 7            (Whereupon the matter is adjourned.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

54

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of USA v. GOUDREAU,

Docket #24m2753, was prepared using digital transcription

software and is a true and accurate record of the

proceedings.


Signature___*Carole Ludwig*_____

                Carole Ludwig

Date:  July 31, 2024